MONTE, Administratrix, Respondent, vs. WAUSAU PAPER MILLS COMPANY, Appellant.

*May 6—May 21, 1907.*

*Master and servant: Assumption of risk of injury.*

1. Plaintiff's intestate, an intelligent and experienced employee in defendant's mill, who was in some way caught and killed while assisting to replace a belt upon a revolving pulley—an operation at which he had many times before assisted,—is *held*, as matter of law, to have known, or to have been chargeable with knowledge of, the danger of being caught by the belt, and to have assumed the risk.

2. To preclude recovery for injury or death in such a case it is not necessary that the employee should have known the danger of the *precise injury* which happened; it is enough that he knew or should have known the *precise danger.*

APPEAL from a judgment of the municipal court for Marathon county: LOUIS MARCHETTI, Judge. *Reversed.*

This is an action to recover damages for the death of the plaintiff's husband while in defendant's employ. The deceased, Dominic Monte, on the 2d day of December, 1904, was a married man thirty-four years of age, and was employed as a laborer in the beater room of the defendant's large paper mill at Brokaw, Wisconsin, and had been so employed for about a year. He was an intelligent, observing man, a good workman, and spoke fairly good English. The mill was operated night and day, and Monte worked one week at night and the following week in the daytime. At the time of his death, December 2, 1904, he was working at night. His regular employment was as a helper on the beaters in the beater room, but he was also subject to call to assist in putting on belts upon the shafting in the basement below the beater room. He had received such a call on the night of his death, and while assisting in putting on a belt was instantly killed.

The situation in the basement where the accident took place may be briefly described as follows: A large five-inch main shaft extending from north to south, deriving its motion from the water-power of the mill, runs in a large room in the basement, eight or nine feet above the floor, the basement being some twenty feet in height. Upon this shaft is a large pulley on which an eighteen-inch belt runs, conveying power to a forty-inch pulley on a countershaft, a number of feet east of the main shaft. This countershaft is in the pump room, directly east of the large room and separated from it by a stone wall, and the eighteen-inch belt comes through an archway in this wall to the countershaft, which

is just east of and parallel with the wall. Upon the counter-shaft, and directly north of and contiguous to the large pulley, is a smaller eighteen-inch pulley upon which a six-inch belt runs, conveying power to the pumps, which are located about eighteen feet further east in the pump room. On each side of the archway in the pump room are brick piers running from east to west and seven or eight feet apart, which extend upwards high enough to support the countershaft, thus making a sort of a passageway seven or eight feet wide in the pump room in which both the large pulley and the smaller pulley on the countershaft revolve some eight or nine feet from the floor and through which the pump belt runs to the pumps. The countershaft revolved at a speed of 130 revolutions per minute, the lower portion of the pump belt running away from the pulley to the pumps and the lower portion of the large belt running towards the countershaft. The pump room was lighted by two incandescent electric lights near the pumps and one in the passageway near the pulleys. The pumps are used to pump stock into the jordan chests above.

At about 1 o'clock on the night in question the pump connected with the countershaft broke, the belt was thrown off, and the night foreman sent for Peter Golla, an expert, to repair it. Golla spent ten or fifteen minutes in repairing the pump, and then it became necessary to put the pump belt on the countershaft pulley. One Dakins, the beater engineer and the immediate superior of Monte, called Monte down to assist in the operation. Monte had assisted in this same operation every time it became necessary during the preceding year, which was on the average about once a week. When all was in readiness there were present in the passageway Michaels, the night foreman, Dakins, Golla, and Monte. A ladder nine or ten feet long stood leaning against the division wall, just north of the archway and next to the north pier, which was always used on such occasions. The shafting was

not stopped, nor was any warning given to any one of danger,. but all the men knew generally what was to be done and all took their places without special direction. Monte mounted to the third round of the ladder and stood facing east, and took hold of the belt with his right hand to assist it onto the top of the pulley, probably steadying himself with his left hand on the pier to the north. Golla stood on the first round of the ladder, supporting the belt also. Dakins stood on a barrel, close to Monte, also supporting the belt, and Michaels stood on the floor further to the east, lightly supporting the belt, which at that point could be reached from the floor. While the men were in these positions the belt suddenly engaged with the pulley and Monte disappeared so quickly that no one saw him. A noise was heard as though a belt was breaking and Golla felt something strike him on the head. Search was immediately made for Monte, and his dead body was found limp on the north side of the north pier, with a bruise on the face, and the right foot, torn off between knee and ankle, on the south side near the south pier. The ladder remained in its position unmoved.

The foregoing constitutes substantially all the evidence relating to the accident.

The complaint alleged negligence in that the place of the accident was insufficiently lighted and was filled with escaping steam and that the floor was slippery; but as the uncontradicted evidence showed that there was no steam and that the light was sufficient, and as it further conclusively appeared that the slippery condition of the floor had nothing to do with the accident, these allegations need not be further referred to. The complaint further alleged negligence in failing to provide a proper and safe platform on which to stand instead of a ladder, and in failing to provide a loose pulley and in failing to warn the deceased of danger.

The jury by special verdict found (1) that the deceased was killed as alleged; (2) that his death was not caused by

coming in contact with the large belt, (3) but was caused by his being caught in the smaller belt and pulley upon which he was working; (4) that the defendant was guilty of negligence which proximately caused the death of Monte; (5) that deceased was not guilty of contributory negligence; (6) that deceased did not know the precise danger to which he was exposed, and ought not in the exercise of ordinary care to have known or comprehended such danger; (7) that defendant knew or ought to have known that deceased did not know or comprehend such precise danger; (8) that the plaintiff's damages were $4,000.

The defendant at the close of the evidence moved for a directed verdict, and after verdict moved for judgment *non obstante,* and further moved to change all the answers of. the special verdict except the first and eighth, and for judgment on the verdict as changed. All these motions were denied and judgment rendered for the plaintiff, from which the defendant appeals.

For the appellant there was a brief by *Kreutzer, Bird & Rosenberry,* and oral argument by *C. B. Bird.*

For the respondent there were briefs by *Sanborn, Lamoreux & Pray, Franklin Bump, Park & Carpenter,* and *H. B. Walmsley,* and oral argument by *Mr. Walmsley.*

WINSLOW, J. It would be a hard heart which could contemplate the facts of the case without feeling the strong appeal which they make to human sympathy. The deceased was an active, intelligent man in the very vigor of early manhood. He occupied no exalted station, but in his humble walk in life he was, so far as the record shows, in every sense a good citizen. He daily met with manful courage his long hours of physical toil, and faithfully devoted his scant earnings to the support of that modest home to which he returned when labor was done to find his best reward. He was cheerfully obeying his employer's call to duty when, without prep-

aration and without warning, his life went out as one would snuff a candle, and his wife and children were left to make their way alone as best they may.

Machinery has done much to ameliorate the condition of the race. It has increased our creature comforts and pleasures a thousandfold and brought them within the reach of the modest income. It has brought to our doors the luxuries of every clime, but it demands in return its regular tribute of human life and limb as inexorably as the car of Juggernaut.

The law, however, deals not with sentiment, nor has it any place for sympathy. Justice is blindfolded. She sees not the litigant, and knows not whether he be rich or poor, or whether he approach in tears or smiles. She attempts to give the same measure to all. The law has laid down certain rules governing the relations of employer and employee and prescribing their reciprocal duties. These rules are doubtless not perfect because human reason is not perfect, but in any system of law there must necessarily be fixed abstract rules by which every litigant's case is to be measured. There can be no changing rule, nor can there be one rule for one case and another rule for another case. This would not only result in absolute chaos, but would also throw wide open the door to favoritism and injustice.

Among the well-established rules which the law has laid down is the rule that an employee of full age and ordinary intelligence working about machinery assumes the risk of those ordinary dangers incident to his work which are open and obvious and which he knows and comprehends or which in the exercise of ordinary care he ought to know and comprehend. Applying this well-settled rule to the facts of the present case, it seems that it must be held as matter of law that the deceased assumed the risk of injury from the belting when he mounted the ladder to put on the belt.

The deceased was a bright, active man, in full possession of the powers of manhood, and rather above than below the

ordinary intelligence of workmen of his class. He had worked in this mill for a year. He had assisted at this very operation many times, and knew so well what was expected that, when the signal was given to put on the belt, he stepped at once to his place on the ladder without specific directions. There was no deficiency of light. He saw the pulleys and the belts, knew the pulleys were revolving with great speed, and he knew that when the belt was engaged with the pulley it would at once move with equal speed. He knew that he stood on the round of a ladder and must balance himself with care if he would avoid contact with the belts. With his experience he must have known that if he or his clothing came in contact with the moving belts there was grave danger of serious injury, if not death. To say otherwise would be to impeach his intelligence. It is said that he may not have appreciated that contact with the belts was likely to result in death, but this is not required. It is only necessary that he knew and appreciated the precise *danger*—not the danger of the precise injury which afterward happened. The precise danger was the danger of being caught in the belts and pulleys and suffering some serious injury. That he knew or ought to have known this precise danger cannot be doubted, and this court must so hold as matter of law.

This conclusion renders unnecessary the discussion of any other questions. The proper motions for judgment notwithstanding the verdict and to change the answers of the verdict and render judgment thereon were made by the defendant, and one or the other of them should have been granted. The case has been full-- tried, all the witnesses to the accident were placed upon the stand, and there was no conflict in their statements. There seems to be no possibility of any change in the situation upon another trial. Final judgment will therefore be ordered.

*By the Court.*—Judgment reversed, and action remanded with directions to render judgment for the defendant dismissing the complaint.